In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2349

Robert Brown,

Plaintiff-Appellant,

v.

Illinois Central Railroad Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4836--Charles P. Kocoras, Judge.

Argued January 22, 2001--Decided June 20, 2001


   Before Bauer, Kanne, and Evans, Circuit
Judges.

   Bauer, Circuit Judge.  Robert Brown,
aided by the Equal Employment Opportunity
Commission ("EEOC") as amicus curiae,
appeals the district court's dismissal of
a claim which he brought under the
Americans with Disabilities Act ("ADA")
42 U.S.C. sec. 12101, et seq. for lack of
subject-matter jurisdiction. The district
court found that Brown's claim was
precluded by the mandatory arbitration
provisions of the Railway Labor Act
("RLA") 45 U.S.C. sec. 151, et seq. For
the reasons set forth below, we affirm.

BACKGROUND

   Illinois Central Railroad Company ("IC")
is a "carrier" by rail under the RLA and
an "employer" under the ADA headquartered
in Chicago, Illinois. IC's operations are
divided into several departments, which
in turn are subdivided into various
groups of employees, or "crafts." Each
craft has its own separate identity, with
its own collective bargaining agreement
("CBA"), work rules, and seniority. Brown
has worked in IC's Transportation
Department in the
trainman/brakeman/switchman ("trainman")
craft/1 since 1979. IC's trainmen are
represented by the United Transportation
Union ("UTU"), which has entered into a

CBA with IC on their behalf.

IC has two types of trainman positions--regularly scheduled, and "guaranteed extra board" ("GEB"). GEB trainmen fill in for absent regular trainmen and allow the railroad to cope with unexpected surges in operations (such as the unscheduled arrival of trains in the yard) which create a need for extra workers on short notice. Prior to May of 1995, IC had two types of GEB positions--"yard" and "road." Trainmen who were assigned to yard jobs worked in a prescribed geographical area and had restricted starting times. Yard GEBs had two assigned days off per week, while road GEBs had no assigned days off. In May of 1995, IC eliminated the yard GEB position. Work that had previously been performed by yard GEBs has since been performed by road GEBs, like Brown.

Road GEB trainmen at IC are called to work according to the following procedure: GEB trainmen are listed on a "call board," with the trainman who has been without a job assignment for the longest period of time at the top, followed in descending order by each trainmen who has worked more recently. When a fill-in worker is needed, an IC crew dispatcher calls the GEB trainman at the top of the list and assigns him to work. While he is working, his name is taken off of the call board. When the trainman finishes his assignment, he "marks back up," meaning that his name is put back on the call board, this time at the bottom of the list. As those above him are called to jobs, their names are taken off the call board, and the worker at the bottom moves up the board until he is again at the top, making him eligible to be called to work when the need arises. This cycle repeats itself continually, constantly changing the order of the trainmen on the list.

Regularly scheduled (non-GEB) trainmen have a specific work schedule and location. They work six days per week on a regular basis, and have one assigned day off per week. By contrast, GEB trainmen do not have assigned days off. The CBA requires IC to staff the GEB with a sufficient number of employees so as to permit both regular and GEB employees to have "reasonable layoffs," but the CBA does not define what constitutes a "reasonable" layoff. Trainmen with the

most seniority at IC fill the regular, six day per week positions. Since it abolished all yard jobs in May of 1995, IC has taken the position that GEB employees be available for work seven days per week, 24 hours a day (subject to the federal hours of service laws). The CBA guarantees GEB trainmen payment for each day they are on GEB status and available to work,/2 regardless of whether they actually work. However, Brown disputes whether seven day per week, 24 hours a day availability is a requirement of the GEB trainman position.

Brown began working for IC in October of 1978, and transferred to the trainman craft in May of 1979. Brown was qualified as a conductor in May 1980, and worked in that position for approximately eight years. At some point during his employment, Brown was diagnosed by his personal physician as having schizoaffective disorder. He was first hospitalized for this condition in 1988, suffering from depression, paranoia, and suicidal feelings. Schizoaffective disorder can interfere with an individual's ability to learn new concepts, and, according to the testimony of one of Brown's treating physicians, it can cause hallucinations, disorganized thinking, delusions, obsessions, social withdrawal, and depressive episodes.

In November of 1989, Brown's personal physician informed IC that Brown's psychiatric condition rendered him unable to withstand the stress associated with the supervisory tasks performed by conductors or foremen, and limited him to "helper only" jobs, such as brakeman or switchman. The parties dispute whether IC immediately accommodated Brown's psychiatric condition, however they agree that since at least April of 1993 IC has allowed Brown to work only "helper" trainman's jobs. This was done while Brown continued to work off of the call board. If a conductor job opened up while Brown was at the top of the list, he would decline the job and it would be assigned to the next trainman on the list. Prior to the reclassification of yard trainman jobs in May of 1995, Brown held a GEB yard job which required him to work various shifts five days per week, with assigned days off on Mondays and Tuesdays. IC found Brown medically qualified to perform this job. Beginning

in June 1995, after assigned rest days were eliminated for all GEB positions, Brown generally would lay off sick on a routine basis two days per week. For approximately one year, IC made no objection to this practice. During this time, Brown's work was generally acceptable and he was never disciplined for poor attendance.

In February of 1996, several months after all Chicago GEB yard assignments were eliminated and replaced with road crews, John Kay became Superintendent of IC's Chicago area operations. Starting the following May, Kay analyzed employee work records which showed the number of days that individual employees were laying off work. After concluding that several employees were laying off excessively, Kay met with several trainmen, including Brown, to discuss their attendance. Kay insisted that Brown be available for work seven days a week. At a meeting on June 11, 1996, Brown gave Kay a note from his physician restricting him to working a maximum of five days a week due to his disorder. IC did not provide Brown the accommodation he requested, and it medically disqualified him from employment on June 13, 1996 on the ground that he would not be available to work seven days per week as required by the GEB trainman position.

Brown remains on IC's seniority list and according to IC he is eligible to return to work if his restrictions are lifted or GEB requirements change. At the time of his disqualification, all regular (6 day per week) trainmen positions were held by trainmen with higher seniority than Brown. However, by the time this case was litigated in the district court, some of those positions were held by employees with less seniority than Brown. At the time of his disqualification, Brown ranked 216th out of 226 on the seniority list, meaning that only 10 trainmen had less seniority than Brown.

UTU urged IC to accommodate Brown, and after IC medically disqualified Brown, UTU pursued a labor grievance on his behalf contending that his disqualification violated the CBA and that he was entitled to a reasonable accom-modation under the ADA. The Public Law Board denied Brown's CBA claims and declined to address his ADA claims,

accepting IC's argument that it lacked the statutory authority to resolve such claims.

After filing a discrimination charge with the EEOC and receiving a Notice of Right to Sue, Brown filed suit under the ADA, claiming that he was qualified to work as a GEB trainman with the reasonable accommodation of being allowed to lay off two days per week, and that IC violated the ADA by disqualifying him from work. Brown was examined by Dr. Alexander Obolsky, plaintiff's expert witness, who opined that it was not necessary that Brown always work exactly five days, followed by two consecutive days off; rather, Brown could work as few as three or as many as to six or seven days in a row (as his condition allowed), so long as he worked five days out of every seven on average. IC moved for summary judgment, arguing that Brown's schizoaffective disorder is not a "disability" under the ADA, that Brown is not a "qualified individual," and that the accommodation that Brown proposed was not "reasonable."  The district court denied the motion, finding that genuine issues of material fact existed as to these issues. IC then moved to dismiss, arguing that because the resolution of Brown's claim required the court to construe various provisions of the CBA, the RLA precluded Brown from bringing his claim in court, and therefore the district court lacked subject-matter jurisdiction over the claim. Accepting IC's arguments, the district court dismissed Brown's ADA claim, and Brown has appealed.

DISCUSSION

The sole issue presented for review is whether the mandatory arbitration provisions of the RLA preclude Brown from bringing his ADA claim in federal court, thereby stripping the district court of subject-matter jurisdiction. The district court answered this question in the affirmative and granted IC's motion to dismiss for lack of subject-matter jurisdiction. We review the district court's decision on this issue de novo. See Monroe v. Missouri Pacific R.R. Co., 115 F.3d 514, 516 (7th Cir. 1997) (citation omitted).

The RLA promotes stability in labor-

management relations by "providing a comprehensive framework for resolving labor disputes" in the railroad industry. Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994) (citing Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 562 (1987)); see also 45 U.S.C. sec. 151a. Specifically, the RLA establishes a mandatory arbitral mechanism for "the prompt and orderly settlement" of two classes of disputes-- "major disputes" and "minor disputes." See 45 U.S.C. sec. 151a. Major disputes "relate to the formation of collective bargaining agreements or efforts to secure them." Hawaiian Airlines, 512 U.S. at 252 (citation and internal quotation omitted). Minor disputes, by contrast, "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions[,]" 45 U.S.C. sec. 151a, and "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." Hawaiian Airlines, 512 U.S. at 253 (citation omitted). All minor disputes "must be adjudicated under RLA mechanisms, which include an employer's internal dispute-resolution procedures and an adjustment board established by the unions and the employer." Monroe, 115 F.3d at 516; 45 U.S.C. sec. 184. A plaintiff's claim is properly characterized as a minor dispute (and is therefore subject to mandatory and exclusive arbitration under the RLA) when the resolution of the plaintiff's claim requires interpretation of the CBA. See Monroe, 115 F.3d at 519; Coker v. Trans World Airlines, Inc., 165 F.3d 579, 583 (7th Cir. 1999) (stating that "[t]he distinguishing feature of a minor dispute is that the dispute can be conclusively resolved by interpreting the existing CBA." (citation and internal quotation omitted)). Therefore, even if Brown's claim is grounded upon rights which stem from some source other than the CBA (such as state law), the claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be "conclusively resolved" by interpreting the CBA. See Hawaiian Airlines, 512 U.S. at 261-62; Consolidated Rail Corp v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 305 (1989).

The ADA prohibits employment

discrimination against "qualified individual[s] with disabilit[ies]." 42 U.S.C. sec. 12112(a). Under the ADA, prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. sec. 12112(b) (5)(A). All covered entities must provide a reasonable accommodation to qualified individuals with disability unless they can demonstrate that such accommodation would impose an "undue hardship" on the operation of their business. See id. The ADA is a comprehensive statute designed to end disability discrimination in the workplace in all industries, and it does not exempt the railroad and airline industries from its reach.

IC argues, and the district court agreed, that the resolution of Brown's ADA claim requires interpretation ofvarious provisions of the CBA. First, IC notes that in attempting to establish that he is a "qualified individual with a disability," Brown will have to demonstrate that he is able to perform the "essential functions" of the job at issue, with or without a reasonable accommodation. Since Brown concedes that his schizoaffective disorder renders him unable to work seven days a week on a consistent basis (and does not argue that a reasonable accommodation would remove this impairment), in order to prevail on his claim he will need to show that being consistently available for work seven days a week is not an "essential function" of the GEB trainman position. However, IC contends that the CBA forecloses Brown from making any such showing because it guarantees GEB Trainman payment for seven days per week regardless of the number of days that they actually work, implicitly requiring seven day per week availability as a quid pro quo for this salary guarantee./3 Brown challenges this interpretation of the CBA, and argues that no CBA provision explicitly establishes seven day per week availability as a requirement of the GEB trainman position./4 IC argues that the conflict between the parties on this issue turns on a dispute regarding the interpretation of the CBA, and as such it must be arbitrated pursuant to the RLA.

Moreover, IC argues that the district

court could not have determined whether Brown's requested accommodation was "reasonable" without interpreting other disputed provisions of the CBA. For example, Section 5, Article 3 of the Trainmens' schedule agreement lists various circumstances under which GEB trainmen should be allowed to lay off from work and provides that "for good reason . . . an employee should be permitted to be absent from work within reasonable limits." It also notes that, while "the company is warranted in controlling the privilege of laying off," "it should do so reasonably." This invites the question of whether the CBA right to "reasonable layoffs" encompasses the right to layoff periodically (and regularly) as needed, even if that means laying off for up to two days per week. IC contends that the district court could not determine whether Brown's requested accommodation was "reasonable" (an essential element of his ADA claim) without answering this question.

Further, IC points to Section 2, Article 55 of the Trainmens' Schedule Agreement ("Article 55"), which provides:

[w]hen established runs are changed by advancing or retarding the earliest listing time one hour or more, or a change is made in the number of days the run is bulletined to operate each week, . . . it will be considered a new run and bulletined accordingly.

Applying this provision, IC argues that granting Brown the accommodation he seeks would amount to creating a new position (namely, a GEB position requiring less than 7 days of availability per week) which IC would be obligated to place up for bidding among the other trainmen. IC maintains that allowing Brown the right to the regular layoffs he requests without first offering this privilege to trainmen with greater seniority would flout both Article 55 and the general seniority provisions established under the CBA. Such an accommodation would be unreasonable as a matter of law, because "the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees." See Eckles v. Consolidated Rail Corp., 94 F.3d 1041, 1051 (7th Cir. 1996). Therefore, IC argues that the

merits of Brown's ADA claim depend upon an interpretation of the CBA (i.e., that an interpretation of the CBA will "conclusively resolve" the claim), and consequently, that the claim is a "minor dispute" which is preempted/precluded by the RLA. The district court accepted these arguments.

Brown counters that there is nothing in the CBA that requires seven day per week availability, so there is no need to interpret the CBA when determining the "essential functions" of the GEB trainman position for ADA purposes. He also denies that granting him the accommodation he seeks would create a new position and violate the CBA by infringing on the seniority rights of other workers./5 In support of this, Brown notes that the Guaranteed Extra Board operates in a "singularly non-seniority manner"; workers are called off the call board for work in the order that their names appear on board, which in turn is determined strictly by when each worker "marked back up." Consequently, the order of the trainmen on the call board changes constantly without regard to the CBA's seniority provisions. Therefore, Brown contends that if he were permitted to lay off in the manner he requests, he would not receive rights or privileges denied to other GEB trainmen, thereby creating a new position and implicating the CBA's seniority provisions. Rather, he would merely delay his own opportunity to work off of the call board, and would open up a job for the next trainman on the board. Brown asserts that causing a fellow worker to jump ahead one space on the call board and to perform work that he was already slated to perform a bit earlier than he had planned does not in any way change the operation of the call board or infringe on the seniority rights of other trainmen. In addition, Brown claims that the fact that he actually used this requested method of accommodation for a year before his disability-based disqualification and received no complaints from either the union, the railroad, or other workers proves that it did not violate the CBA's seniority provisions.

While we do not accept all of IC's arguments, we agree that the resolution of Brown's ADA claim depends in one crucial respect upon interpretation of

the CBA. The CBA expressly states that "when a change is made in the number of days the run is bulletined to operate each week, it will be considered a new run and bulletined accordingly." Therefore, it seems quite possible that the accommodation that Brown seeks would create a new position that is subject to bidding under the CBA. Therefore, allowing Brown to lay off in the manner that he requests without first offering the same layoff privileges to more senior trainmen might very well violate the seniority system established by the CBA. This seems particularly likely given that Brown requests regular layoffs of up to two days per week, and the regular (non-GEB) trainman position (which at the time of Brown's disqualification was held exclusively by trainmen with greater seniority than Brown) has only one assigned day off per week. Moreover, and most important for our purposes, the determination of whether or not Brown's requested accommodation would violate the seniority provisions of the CBA will potentially be dispositive of Brown's ADA claim, because requested accommodations which would interfere with the bona fide seniority rights of other employees are unreasonable as a matter of law, and not mandated by the ADA./6 See Eckles, 94 F.3d at 1051. Therefore, the adjudication of Brown's ADA claim cannot go forward until Article 55 and the seniority provisions of the CBA are interpreted, and the court's interpretation of those provisions could conclusively resolve Brown's claim, making it a "minor dispute" under the RLA. The fact that GEB trainmen are called to work from the call board in chronological order rather than according to seniority does not change this fact. The important question is not how work is assigned among GEB trainmen, nor how Brown's requested layoffs would affect the chronology of trainmen assignments. Rather, the question raised by IC is whether allowing Brown to lay off as he requests would create for Brown a GEB trainman position entailing fewer regular hours per week than the standard GEB trainman position, therefore creating a new position under Article 55 of the CBA./7

    However, even though Brown's ADA claim cannot be resolved without interpreting the CBA, it is not immediately clear whether this fact alone will prelude him

from bringing the claim in federal court. Amicus EEOC argues that while the RLA's mandatory arbitration provisions strip courts of jurisdiction to adjudicate state law claims whose resolution depends upon an interpretation of a CBA, see e.g., Hawaiian Airlines, 512 U.S. at 261–63 (applying Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988)), they do not as a matter of course preclude similar claims brought under a federal statute. Unlike cases involving the RLA's preemption of state law, Brown's case forces us to decide whether the RLA precludes a claim brought under another federal statute, and this choice "requires an analysis of both [federal statutes], to see if they are indeed incompatible or if they can be harmonized, and if they are incompatible to decide which one Congress meant to take precedence." Coker, 165 F.3d at 583–84 (citations omitted). Therefore, according to the EEOC, the district court applied the wrong analysis when it determined that Brown's ADA claim was barred simply because it could be characterized as a "minor dispute," rather than carefully analyzing the two federal statutes at issue to determine what effect Congress intended each to have upon the other. Further, the EEOC asserts that the district court erred in relying on cases involving the RLA's preemption of state law claims.

We do not agree that the district court applied the wrong analysis when deciding Brown's claim. First, the district court was aware that its task was to analyze the ADA and the RLA "to determine if they are incompatible or if they can be harmonized," and the court made it clear that its holding was an attempt to harmonize the two statutes (or to give them simultaneous effect). The district court thus applied the proper preclusion standard, and did not decide the case entirely by resorting to preemption standards. Second, we do not find that cases addressing the RLA's preemption of state law claims are wholly irrelevant to the cases like Brown's which involve the RLA's potential preclusion of a claim brought under another federal statute. While the two types of cases implicate some different concerns, see Coker, 165 F.3d at 583 (citations omitted) (stating that, unlike preemption, "the question of whether one federal law takes precedence

over another does not implicate the Supremacy Clause"), we find the preemption question sufficiently similar to the preclusion question to make the analysis employed in the RLA preemption cases applicable here. See Saridakis v. United Airlines, 166 F.3d 1272, 1276 (9th Cir. 1999) (stating that "the preemption doctrine per se does not govern questions relating to the compatibility of two of more federal laws," but noting that "[l]ike the preemption question, [the preclusion] inquiry centers on congressional intent," and applying RLA preemption cases like Hawaiian Airlines in its preclusion analysis); Felt v. Atchison, Topeka, & Santa Fe Ry. Co., 60 F.3d 1416, 1418-19 (9th Cir. 1995) (same); see also Schiltz v. Burlington Northern R.R., 115 F.3d 1407, 1415 (8th Cir. 1997) (relying on RLA preemption standards in holding that the RLA precluded a plaintiff-employee's ADEA claim which was "inextricably intertwined" with provisions of a CBA outlining employees seniority rights); Fry v. Airline Pilots Ass'n, Int'l, 88 F.3d 831, 836 (10th Cir. 1996) (ruling that under current Supreme Court jurisprudence "the threshold question remains whether resolution of the federal and state law claims of the plaintiffs requires interpretation or application of the CBAs." (citations omitted) (emphasis supplied)); cf. Hawaiian Airlines, 512 U.S. at 259 n.6 (applying Buell, 480 U.S. 557 (1987), an RLA preclusion case, in the preemption context and stating that the fact that Buell was a preclusion case "does not rob Buell of its force in [the preemption] context" because "principles of federalism demand no less caution in finding that a federal statute pre-empts state law") (citation omitted). The standard established for the RLA's preemption of state law will not by itself conclusively resolve the question of whether the RLA precludes another federal claim, because the latter question requires courts first to analyze the two federal statutes in an effort to ascertain Congressional intent. Nevertheless, the RLA preemption standard remains relevant to the preclusion inquiry, and we find that the preemption standard should govern in a preclusion case unless the analysis of the two federal statutes clearly suggests otherwise.

Moreover, an examination of the ADA's language and legislative history reveals no clear congressional intent to override the RLA's requirement that minor disputes be adjudicated exclusively through the RLA's arbitration machinery. The EEOC notes that in enacting the ADA, Congress recognized that while the terms of a CBA "could be relevant . . . in determining whether a given accommodation is reasonable . . . the agreement would not be determinative on the issue." H.R. Rep. No. 101-485, pt. 2 at 63 (1990) ("H.R. Rep."), reprinted in 1990 U.S.C.C.A.N. 303, 345; see also S. Rep. No. 101-116, at 32 (1989) ("S. Rep."). In addition, the EEOC points to similar language in the ADA's House and Senate Reports stating that "if the [CBA] includes job duties, it may be taken into account as a factor in determining whether a given task is an essential function of the job." S. REP. at 32; see also H. R. Rep. at 63./8 Relying on this language, the EEOC maintains that Congress expressly contemplated that courts would consider the relevant provisions of a CBA in adjudicating ADA claims, and argues that this evidences Congress' intent that the ADA take precedence over the RLA's provisions providing for the mandatory and exclusive arbitration of all disputes requiring the interpretation of CBAs. Moreover, as further support for this conclusion, the EEOC notes that, unlike ERISA, the ADA contains no provision stating that it was not meant to "alter, amend, modify, invalidate, impair, or supercede any law of the United States . . . or any rule or regulation issued under any such law." See 29 U.S.C. sec. 1144(d). We have found such language sufficient to preserve the RLA's exclusive jurisdiction over minor disputes brought under ERISA, see Coker, 165 F.3d at 584, and the EEOC concludes from the absence of a similar provision in the ADA that we should reach the opposite conclusion here. In addition, the EEOC relies on a portion of the ADA's legislative history providing that an employer's "obligation to comply with [the ADA] is not affected by any inconsistent term of any collective bargaining agreement to which it is a party" because "an employer cannot use a collective bargaining agreement to accomplish what it otherwise would be prohibited from doing under this Act." H.R. REP. at 63; see also S. REP. at 32.

Finally, the EEOC notes that the ADA is a comprehensive Act intended to determine certain personal rights for workers in all industries, and that it does not expressly exempt the railroad industry from its reach as do certain other statutes. See, e.g., 29 U.S.C. sec. 213(b)(2). However, we do not find that any of this amounts to a clearly expressed Congressional intent to override any requirement of the RLA. The passages from the ADA's legislative history quoted above are not inconsistent with the standard rule regarding the RLA's preemption or preclusion of minor disputes. It has long been established that "not all cases which tangentially touch collective bargaining agreements call for . . . preemption." Monroe, 115 F.3d at 519 (quoting Loewen Group Int'l, Inc. v. Haberichter, 65 F.3d 1417, 1423 (7th Cir. 1995). "When the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Loewen, 65 F.3d at 1421 (quoting Livadas v. Bradshaw, 512 U.S. 107, 124 (1994)). Therefore, the mere fact Congress anticipated that courts could "look to" (or "consider") the provisions of a CBA in deciding an ADA claim does not imply that Congress intended to override the traditional preemption/preclusion standards under the RLA. (This is particularly true given that the parties to an ADA claim often might not even dispute the interpretation of the CBA provisions at issue.) Moreover, as has been noted, under the established RLA preemption/ preclusion rule, the RLA will not bar a plaintiff from bringing an independent state or federal claim in court unless the claim could be "conclusively resolved" by the interpretation of a CBA (that is, unless the interpretation of some provision(s) of the CBA could be dispositive of the plaintiff's claim). Since the provisions of a CBA are relevant but not dispositive in determining whether a proposed accommodation is reasonable or whether a particular job function is an "essential function" under the ADA, it could be argued that a court's consideration of CBAs for such purposes in general would not transform the claim into a minor dispute subject to preclusion by the RLA./9 However, when the heart of the

dispute between the parties is a disagreement over the interpretation of some part of a CBA, the resolution of which could by itself resolve the claim, the claim would be precluded by the RLA under the traditional rule. Nothing in the text or legislative history of the ADA clearly overturns this rule, and we find the mere absence of language in the Act exempting railroads from its reach or stating that it was not meant to alter prior laws insufficient to do so. Without clearer guidance from Congress, we must conclude that Congress did not intend for the ADA to displace the RLA's mandatory arbitration provisions. See United States v. Palumbo Bros., Inc., 145 F.3d 850, 865 (7th Cir. 1998) ("Absent a clearly expressed intention that Congress intended one federal statute to preempt another, courts must regard each as effective and give them simultaneous effect.") (citation omited). We feel that the best way to harmonize these two statutes is to allow a plaintiff employee to bring an ADA claim in federal court against his employer (even if his employment is governed by a CBA which is subject to the RLA), unless the resolution of his ADA claim requires the court to interpret the CBA's terms as a potentially dispositive matter. Accordingly, because Brown's claim requires a potentially dispositive interpretation of the CBA's seniority provisions, we hold the RLA precludes his claim. Allowing Brown to bring his claim in federal court would sanction a judicial incursion into what the RLA defines as the exclusive province of the RLA arbitration boards--the resolution of claims by reference to the terms of CBAs. This would "lead to the evisceration of the grievance and arbitration procedures provided by the RLA," see Schiltz, 115 F.3d at 1415, and we are unwilling to take this bold step without a clearer Congressional mandate.

However, one further challenge to our holding needs to be addressed. In addition to its argument from the legislative history of the ADA, the EEOC contends that relevant case law conclusively establishes that the RLA cannot preclude a plaintiff from obtaining judicial resolution of independent claims brought under federal statutes like the ADA which confer rights upon individual employees. Relying on

Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), the EEOC notes that contractual rights arising under a CBA and statutory rights provided by federal employment discrimination laws are "distinctly separate" in nature and independent of one another, and that an aggrieved employee is free to vindicate each type of right separately in its proper forum (by bringing CBA rights to arbitration or to whatever forum the CBA dictates, and by litigating federal statutory claims in court). See Gardner-Denver, 415 U.S. at 50-52. The EEOC also points to language in Gardner-Denver stressing that arbitrators have "authority to resolve only questions of contractual rights," and have "no general authority to invoke public laws that conflict with the bargain between the parties," see id. at 53-54, arguing that claimants like Brown who seek judicial resolution of their federal claims should not be forced to bring those claims before an arbitrator who lacks the authority to resolve them.

Moreover, relying on Buell--a case which addressed the RLA's effect upon a claim brought under the Federal Employers' Liability Act (FELA)--the EEOC argues that the RLA's requirement of binding arbitration of contractual disputes does not preclude a disabled employee from seeking judicial enforcement of his independent statutory right to a workplace free from disability discrimination under the ADA. In Buell, the Court rejected the defendant-railroad's argument that the RLA provides "the exclusive forum for any dispute arising out of workplace conditions," reasoning that "notwithstanding the strong policies encouraging arbitration, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." 480 U.S. at 563, 565 (citation and internal quotation omitted). The Court held that "the fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action for damages." Id. at 564.

However, while the cases cited by the EEOC stress the independence of claims brought under federal statutes from

similar claims brought pursuant to the provisions of a CBA, and establish a plaintiff's general right to judicial resolution of his federal claims, none of them hold that a federal claim whose resolution depends upon the interpretation of a CBA should not be precluded by the RLA. The question presented in Gardner-Denver as whether an employee's statutory right to trial de novo for a claim brought under Title VII may be foreclosed by the plaintiff's prior submission of a claim involving the same facts to final arbitration under the nondiscrimination clause of the CBA. Gardner-Denver held that the plaintiff could bring his Title VII claim in federal court, regardless of whether or how his claims brought under the CBA's discrimination clause were resolved, because his Title VII rights were distinct from and independent of his rights under the CBA. However, unlike Brown's ADA claim, the Title VII claim brought in Gardner-Denver did not depend for its resolution on the interpretation of a CBA. Gardner-Denver holds only that "the federal policy favoring arbitration does not establish that an arbitrator's resolution of a contractual claim is dispositive of a statutory claim under Title VII." 415 U.S. at 46 n.6. While we certainly do not question that proposition, it does not guide us in resolving the matter before us. IC does not argue that Brown cannot bring his ADA claim in federal court because he previously brought a similar claim under some anti-discrimination clause of the CBA; rather, it argues that under the facts of this case, the resolution of Brown's ADA claim itself depends upon interpretation of the CBA. Therefore, Gardner-Denver is inapposite./10

  We find Buell inapplicable for similar reasons. Buell held that the fact that an employee's injury which was otherwise compensable under FELA "was caused by conduct that might have been subject to arbitration under the RLA" did not deprive a Railroad employee of the right to bring a FELA claim for damages. See 480 U.S. at 564. Buell's FELA claim was a simple negligence claim which presumably required the court merely to analyze the facts regarding his employer's and his co-worker's conduct and to determine whether that conduct constituted actionable negligence under the standards

established by FELA./11 Like the claim presented in Gardner-Denver, the resolution of Buell's claim did not require the interpretation of a CBA, and Buell is therefore of tenuous relevance to Brown's case. Buell addressed the narrow question of whether the mere fact that certain conduct might have been grieved through the arbitration machinery established by the RLA by itself precluded a plaintiff from bringing a claim under FELA. Answering this question in the negative, the Court stated that an injured worker should not be denied recovery under FELA "simply because he might also be able to process a narrow labor grievance under the RLA to a successful conclusion." Id. at 565 (emphasis supplied). Relying on Gardner-Denver and its progeny, the Buell Court rejected the Railroad's argument that the RLA's grievance machinery is the exclusive remedy for any of its employees' claims regarding workplace conditions. ("This Court has, on numerous occasions, declined to hold that individual employees are, because of the availability of arbitration, barred from bringing claims under federal statutes." Id. at 564 (citations omitted)). Buell therefore stands for the general and rather unremarkable proposition that the RLA does not automatically preclude all claims brought under independent federal statutes merely because the same conduct could be characterized as a violation of the CBA and grieved pursuant to the RLA. However, Buell does not hold that claims based on federal statutes which can themselves be conclusively resolved by interpretation of a CBA may be brought in federal court./12

Therefore, the language in Gardner-Denver, Buell, and their progeny stressing both the independence of federal statutory claims from CBA claims and the inability of CBA arbitrators to adjudicate federal statutory rights and to enforce federal statutory remedies must be understood in its proper context and should not be read to permit Brown's claim to go forward. The EEOC relies on this language to argue that claims brought by employees pursuant to federal statutes which create rights for individual workers are not precluded by the RLA, simply because they seek to enforce rights which exist independently of the CBA. We reject this argument for

three reasons. First, we have already dismissed the argument in no uncertain terms. See Monroe, 115 F.3d at 518-20 (holding that the RLA precluded a claim brought under FELA because the resolution of the claim required interpretation of the CBA). In addition, as we have noted, the relevant precedents from the Supreme Court and the Courts of Appeals do not support the argument. Indeed, they consistently rule that claims brought under federal or state statutes which can be "conclusively resolved" by an interpretation of a CBA are not truly "independent" from the CBA, and are therefore precluded by the RLA. See Hawaiian Airlines, 512 U.S. at 257-63; Lingle, 486 U.S. at 407 (stating that the state law remedy at issue in that case was "independent" of the collective-bargaining agreement "in the sense of 'independent' that matters for [LMRA] sec. 301/13 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement"); Saridakis, 166 F.3d at 1277 (stating that "as long as the . . . claim can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the agreement") (quotation omitted). Finally, a bright-line rule that the RLA does not preclude claims brought under other federal statutes cannot be reconciled with the requirement that when conducting a preclusion inquiry a court must examine each federal statute to determine the effect that Congress intended the statutes to have upon each other. Thus, we decline to hold that the RLA's preclusive effect is determined in each case entirely by the source of the right asserted in the plaintiff's claim. It remains true as a general rule that the RLA will not bar a plaintiff from bringing a claim under an independent federal statute in court (because such claims are generally independent of the CBA and will be adjudicated under non-CBA standards). However, this rule no longer applies if the federal claim asserted by the plaintiff depends for its resolution on the interpretation of a CBA. Such claims are not "independent" of the CBA regardless of their source, and are therefore precluded by the RLA.

We close by stressing the limited scope of our holding. A claim brought under an independent federal statute is precluded

by the RLA only if it can be dispositively resolved through an interpretation of a CBA. This occurs "only when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent upon an analysis of the terms of a collective bargaining agreement." Loewen, 65 F.3d at 1423 (citations omitted). Therefore, an employer cannot ensure the preclusion of a plaintiff's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim, see id., or by arguing that the action challenged by the plaintiff is "arguably justified" by the terms of a CBA. See Hawaiian Airlines, 512 U.S. at 265-66. Nor will a claim be precluded merely because certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor in deciding a claim or a defense. Therefore, Brown's claim would not have been precluded if either the parties did not dispute the interpretation of the relevant CBA provisions (and Brown had merely argued that he was entitled to a certain reasonable accommodation under the ADA notwithstanding anything to the contrary in the CBA),/14 or if the disputed provisions of the CBA were relevant but not dispositive of Brown's claim (as the CBA's provisions describing job functions are in relation to the ADA "essential function" determination). However, because in this case the interpretation of the CBA's seniorityprovisions could dispose of Brown's entire ADA claim as a matter of law, his claim is not truly "independent" of the CBA and is precluded by the RLA. Brown asserts that courts should allow ADA claims "to be judicially adjudicated in any instance where that can be done without doing actual violence to the competing statute." We agree. That is why an ADA claim should be permitted to go forward in all instances (even if the claim "tangentially touches" a CBA, or if a CBA claim based on the same facts has or is being arbitrated) unless, as here, it requires interpretation of a CBA which could conclusively resolve the claim. Abandoning this limitation and allowing Brown's claim to go forward would "do actual violence" to the RLA.

CONCLUSION

We have considered Brown's other arguments, and find them meritless. For the foregoing reasons, the district court's decision to dismiss Brown's claim for lack of subject-matter jurisdiction is AFFIRMED.

FOOTNOTES

/1 The trainman craft includes trainmen/brakemen/switchmen ("trainmen") and conductors. A trainman's primary job duties are to throw track switches, couple and uncouple cars, couple and uncouple hoses, and engage and disengage brakes. Conductors perform trainman duties and supervisory functions.

/2 However, an employee who lays off sick is not paid for that day.

/3 The CBA provides that "[e]ach employee assigned to the guaranteed . . . extra board shall be guaranteed 14 days at the conductor road switcher rate each bi-weekly period." Crew Consist Agreement, Art. III, Section 2, R. 60, Ex. 2, p. 8. IC argues that the requirement of seven day per week availability was something that IC aggressively bargained for after it eliminated regular yard jobs.

/4 Brown also notes that the IC's job description for the trainman position does not list as part of the job's requirements that the employee be available 7 days per week.

/5 Brown also notes that the UTU has never taken this position either, but instead has urged IC to grant Brown the accommodation he seeks.

/6 It should be noted that this rule only applies if the seniority system at issue is "bona fide," or created for a legitimate purpose rather than a discriminatory purpose. See Eckles, 194 F.3d at 1046 n.7, 1051. However, Brown does not argue that the CBA's seniority system was not "bona fide."

/7 Moreover, the fact that Brown effectively implemented the accommodation he seeks by laying off as needed for one year and no one complained says nothing about whether allowing Brown to work in this manner created a new position under Article 55 and should have been listed for bidding.

/8 See also 29 C.F.R. sec. 1630.2(n)(3) (2000) (stating that evidence of whether a particular function is essential for ADA purposes includes, but is not limited to:

(i) The employer's judgment as to which functions

are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. (emphasis supplied)).

See also Lenker v. Methodist Hosp., 210 F.3d 792, 796 (7th Cir. 2000).

/9 For this reason, unlike the district court, we reject IC's arguments that Brown's claim is precluded by the RLA merely because the court would have to consult certain provisions of the CBA in determining whether seven day per week availability is an "essential function" of the GEB trainman position.

/10 Moreover, we note that Gardner-Denver involved the relationship between mandatory arbitration provisions contained in a CBA and claims brought under federal statutes, and did not address the effect that the RLA's mandatory arbitration provisions have upon other federal claims. (Indeed, the CBA at issue in Gardner-Denver was not even governed by the RLA, since the employer was not a "carrier" under the RLA.) Thus, Gardner-Denver was not a true "preclusion" case at all, much less an RLA preclusion case, and its relevance to Brown's case appears even more remote.

/11 We note that Buell would not be barred from bringing this type of claim in court even under the standards established in the RLA preemption cases. "[P]urely factual questions about an employee's conduct or an employer's conduct and motives do not require a court to interpret any term of a collective-bargaining agreement," and are therefore not preempted by the RLA. See Hawaiian Airlines, 512 U.S. at 261 (citation and internal quotations omitted).

/12 Similarly, none of the ADA cases from other circuits on which the EEOC relies involve an ADA claim whose resolution depends upon interpretation of a CBA. See Saridakis, 166 F.3d at 1277 (holding that the RLA did not preclude a plaintiff airline employee from bring an ADA claim against his employer, where his asserted ADA right was independent of the CBA and thus could not be "conclusively resolved" by applying CBA standards, and where the resolution of the claim would require the court to "review the facts underlying [plaintiff]'s termination" as well as the employer's motives, but would not require an interpretation of the CBA); Benson v. Northwest

Airlines, Inc., 62 F.3d 1108, 1115 (8th Cir. 1995). But see Bates v. Long Island R.R. Co., 997 F.2d 1028, 1034-35 (2d Cir. 1993) (applying Gardner-Denver and its progeny and holding that the RLA did not preclude the plaintiff's claim under the Rehabilitation Act even though it implicated portions of the CBA, reasoning that "absent the same rights and procedures provided in federal court, arbitration should not be the sole forum for final resolution of federal civil rights claims").

/13 In Hawaiian Airlines, the Court adopted Lingle's standard for addressing LMRA preemption to resolve claims of RLA preemption. See 512 U.S. at 263. Thus, Lingle is directly on point.

/14 Such arguments can succeed, because not all provisions of a CBA "are immune from limitation by the ADA duty to reasonably accommodate." See Eckles, 94 F.3d at 1052. Unfortunately for Brown, however, bona fide, collectively-bargained seniority systems which establish rights in other employees are "immune" in the sense that they cannot be subverted or superceded by any command of the ADA.