**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1887**

───────────────

DUNCAN E. GILES,

        Plaintiff - Appellant,

    v.

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),

        Defendant - Appellee.

───────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  David C. Keesler, Magistrate Judge.  (3:19-cv-00191-DCK)

───────────────

Argued:  October 28, 2022                    Decided:  February 10, 2023

───────────────

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

───────────────

Affirmed by published opinion.  Senior Judge Floyd wrote the opinion in which Judge Richardson and Judge Quattlebaum joined.

───────────────

**ARGUED:**  Geraldine Sumter, FERGUSON CHAMBERS & SUMTER, P.A., Charlotte, North Carolina, for Appellant.  Stephen Douglas Dellinger, LITTLER MENDELSON, P.C., Charlotte, North Carolina, for Appellees.  **ON BRIEF:**  Chandler Bryant, FERGUSON CHAMBERS & SUMTER, P.A., Charlotte, North Carolina, for Appellant.

───────────────

FLOYD, Senior Circuit Judge:

Plaintiff-Appellant Duncan E. Giles brought suit against Defendant-Appellee the National Railroad Passenger Corporation ("Amtrak"), alleging that Amtrak suspended and subsequently terminated him based on his race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1] Following discovery, Amtrak moved for summary judgment, which the district court granted. Giles now appeals. For the reasons that follow, we affirm.

I.

Giles began working for Amtrak in 1999 as a train attendant, and he became a train conductor in 2009. On April 19, 2015, he was assigned to the outbound crew of a train leaving Raleigh, North Carolina. Before boarding the train, Giles spoke with his supervisor, trainmaster Michael Hibbert, who informed him that a different trainmaster, Amy Sine, would be the supervising trainmaster in Raleigh. Giles did not know Sine or what she looked like. Hibbert also informed Giles that Sine would have a crew with her to uncouple—or detach—a car from the train. Giles interpreted this instruction to mean that he would not need to help with the uncoupling process.

To uncouple a car, the crew must follow specific safety procedures to prevent

---

[1] Giles's complaint includes only one count (race discrimination under § 1981), but its introduction suggests that he intended to bring both a discrimination and a retaliation claim. The district court addressed the implied retaliation claim, finding that Giles "plainly" failed to establish a prima facie case of retaliation. *Giles v. Nat'l R.R. Passenger Corp.*, CIVIL ACTION NO. 3:19-CV-191-DCK, 2021 WL 3009015, at *7 (W.D.N.C. July 15, 2021). Giles does not discuss a retaliation claim in his opening brief, and, as such, has waived any challenge to the district court's grant of summary judgment to Amtrak on the claim. We therefore only consider the discrimination claim.

electrocution and other injuries. These procedures include completing certain paperwork, communicating with the train line, conducting a crew briefing on the uncoupling, requesting certain protection from the engineer to walk between the train cars, and ensuring that the parts that connect the car to the train are disconnected in the proper order. The crew briefing involves the conductor, an assistant conductor, and an engineer.

On April 19, Giles first encountered Sine in the crew room in Raleigh. Sine was not wearing an Amtrak uniform or identification. According to Giles, Sine rushed into the room and directed him to participate in the uncoupling. Giles refused, stating that he did not know her. Sine reiterated her order, but Giles continued to argue with her and stated that she could "take [him] to an investigation." J.A. 41:18–19.

Sine then stepped away and contacted Hibbert to inform him of Giles's refusal, and to confirm that Giles was supposed to help with the uncoupling. After receiving confirmation, Sine returned to Giles and told him, "I am giving you a direct order that, as the conductor, you will cut that car off the rear of the train here in Raleigh." J.A. 112:5–7. Giles once again declined. Sine responded, "So we are clear here, you are refusing a direct order?" to which Giles responded, "Yes." J.A. 112:10–12. At some point during this interaction, Hibbert and Giles spoke by phone. Though the precise timing of their conversation is unclear, Hibbert confirmed Sine's identity and clarified that Giles was to help uncouple the car. J.A. 215; *see also* Giles's Resp. to Amtrak's Mot. for Summ. J. 2, Civil Action No. 3:19-CV-191-DCK (ECF No. 34) (stating that, once Giles "learned who Sine was," he attempted to rejoin the crew after Sine dismissed him). Nonetheless, Giles continued to defy Sine's instructions. When it became clear that Giles would not comply,

3

Sine informed Giles that she would take his place in the uncoupling. She then attached herself to, and briefed, the crew. Giles was not present for her briefing.

Later, when Sine and the crew were working on the uncoupling, Giles attempted to rejoin them. Sine refused his help to protect the crew's and passengers' safety, but Giles repeatedly attempted to interfere. He also yelled at Sine, creating a "chaotic" scene in front of passengers and state partners. J.A. 115:19.

The next day, Hibbert met with Giles to discuss the incident, then placed Giles out of service pending an investigation. Following the investigation, Amtrak charged Giles with several rule violations. These included insubordination, which Amtrak considers "a terminable offense due to its severity and adverse impact in the workplace." J.A. 238; *see also* J.A. 86 (Amtrak's Standards of Excellence) ("Part of teamwork is properly performing your duties. Another part is following instructions. Therefore, you must comply with . . . all instructions, corrections, and orders from supervisors and managers."); 244 (Decision of the Public Law Board) ("It is well-established that gross insubordination or refusal to perform assigned work is the type of offense that often leads to termination of employment.").

As a member of the Sheet Metal, Air, Rail, and Transportation Workers Union (the Union), Giles was entitled to a full hearing on the charge, during which he could testify under oath, have the assistance of a Union representative, and cross-examine witnesses, pursuant to the collective bargaining agreement (CBA) between the Union and Amtrak. He also had the right to appeal a guilty verdict to Amtrak's Office of Labor Relations (the OLR).

4

After Giles's initial hearing, the hearing officer concluded that he committed insubordination. Amtrak subsequently terminated Giles on November 25, 2015. Giles then appealed the termination to the OLR, which affirmed the termination. The Union then brought a grievance arbitration claim on Giles's behalf before the Public Law Board,[2] which also found Giles's actions to be "grossly insubordinate," "belligerent[,] and argumentative." J.A. 244–45. It likewise upheld Giles's termination.

On April 18, 2019, Giles filed his complaint in federal district court, alleging race discrimination in violation of § 1981. Amtrak subsequently moved for summary judgment. On July 15, 2021, the district court granted Amtrak's motion, explaining that Giles failed to establish a prima facie case of race discrimination. First, the court reasoned that Giles failed to demonstrate satisfactory job performance at the time of his suspension and termination, which justified Amtrak's disciplinary action. It continued that Giles also failed to identify a similarly situated comparator treated more favorably. Specifically, Giles argued that a white coworker at Amtrak, Anthony Martino, refused to follow a direct order from Hibbert regarding his schedule, but Amtrak did not terminate him. However, Giles lacked first-hand knowledge of that incident and its aftermath, instead relying on declarations from coworkers to substantiate his assertions. The court declined to consider these declarations, deeming them hearsay. It further noted that Martino's behavior did not implicate the same safety concerns as Giles's. Finally, the court concluded that, even if Giles presented a prima facie case, Amtrak indisputably offered a legitimate, non-

---

[2] Public Law Boards are private arbitration panels organized by agreement between parties pursuant to the Railway Labor Act. 45 U.S.C. § 153 (second).

5

discriminatory reason for his termination—the severe safety risks that Giles's insubordination posed.

## II.

This Court reviews motions for summary judgment de novo. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Under the federal rules, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* (citation omitted). The Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the "initial responsibility" of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that threshold burden, the nonmoving party must then go beyond the pleadings and affidavits and show that there are "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Under this standard, "[t]he mere existence of a scintilla of evidence" is insufficient to withstand an adequately supported summary judgment motion. *Anderson*, 477 U.S. at 252. Similarly, "conclusory allegations or denials, without

6

more, are insufficient to preclude granting [a] summary judgment motion." *Wai Man Tom*, 980 F.3d at 1037 (citation omitted).

III.

A.

As an initial matter, Amtrak asserts that the district court should have dismissed plaintiff's complaint as precluded by the RLA.[3]  Giles does not address this matter on appeal.  The RLA promotes stability in labor-management relations by "providing a comprehensive framework for resolving labor disputes" in the railroad industry. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (citations omitted).  It "establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes." *Id.* (citation omitted).  The first includes major disputes, meaning those related to "the formation of collective [bargaining] agreements or efforts to secure them." *Id.* (alteration in original) (citation omitted).  The second includes minor disputes, or those that "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions" that "involve 'controversies over the meaning of an existing [CBA] in a particular fact situation.'" *Id.* at 252–53 (first alteration in

---

[3] Importantly, we decline to decide whether the RLA's arbitration provision "is jurisdictional or simply an element of a plaintiff's claim for relief"—an issue on which the circuits are split. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 509 (2006). *Compare Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 237 (D.C. Cir. 2013) (holding that the RLA arbitration provision is jurisdictional and cannot be waived), *with Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 790 (6th Cir. 2012) (holding that RLA arbitration is mandatory but not jurisdictional).  Instead, we assume without deciding that the provision is jurisdictional and address only whether preclusion applies here.

original) (citations omitted).  Giles's claim clearly does not fit the first category, which concerns the creation of contractual rights.  *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302 (1989).  Consequently, to determine whether RLA preclusion applies, we focus on whether his claim falls within the second category.

The Fourth Circuit has not spoken directly on whether race-discrimination claims under § 1981 constitute minor disputes precluded by the RLA.  Generally, "the RLA will not bar a plaintiff from bringing a claim under an independent federal statute in court (because such claims are generally independent of the CBA and will be adjudicated under non-CBA standards)."  *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 667–68 (7th Cir. 2001).  But a federal claim that "depends for its resolution on the interpretation of a CBA" lacks independence from the CBA, and the RLA precludes it.  *Id.* at 668.

The RLA does not preclude Giles's discrimination claim.  Amtrak asserts that Giles's "theory of the case—the comparison between him and Martino—depends on the interpretation and application of the CBA," which "has specific provisions discussing the severity of performance issues, disciplinary procedures, and avenues for appeal."  Resp. Br. at 17.  Amtrak compares this case to *Lee v. Norfolk Southern Railway Co.*, 912 F. Supp. 2d 375 (W.D.N.C. 2012), where a district court found that the RLA precluded the plaintiff's race-discrimination claim under § 1981.  There, the plaintiff explicitly asserted that "the [CBA] was improperly applied," that "he was refused training and seniority" in violation of the CBA, and that he was disciplined more harshly than his white coworkers for drinking alcohol while on duty and for other regulatory violations.  *Lee*, 912 F. Supp. 2d at 377, 377.  The court reasoned that the RLA preempted these claims because they all required "a

8

construction or application of [the plaintiff's] rights under his employment contract." *Id.* at 380–81.

Giles's case is distinguishable from Lee.  True, like the *Lee* plaintiff, Giles argues that he faced more severe discipline than a white employee who allegedly committed similar insubordinate behavior.  But in contrast to that case, provisions of the CBA regarding discipline are not dispositive to Giles's claim.  *See Brown*, 254 F.3d at 664.  Although these provisions might be relevant to understanding how Amtrak defines and punishes insubordination, "[t]he mere need to consult a collective bargaining agreement does not require preemption." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 873 (7th Cir. 2011) (holding that the RLA did not preempt claims of discrimination under federal and state law because they alleged discriminatory enforcement of a CBA but did not "call the [CBA] itself into dispute").  Here, the gravamen of Giles's race discrimination claim is that Amtrak engaged in "disparate disciplinary actions" in violation of § 1981, not that Amtrak violated the CBA or improperly applied it to him.  *McAlester v. United Airlines, Inc.*, 851 F.2d 1249, at 1253 (10th Cir. 1988).  Simply put, he asserts a right under an independent federal statute, not the CBA, and we need not interpret the CBA to resolve this case.  Thus, even assuming that the RLA's arbitration provision is jurisdictional, the RLA does not preclude us from considering Giles's discrimination claim.

## B.

The district court properly granted summary judgment to Amtrak because Giles failed to present a genuine dispute of material fact as to whether Amtrak suspended and

terminated him based on race. When addressing race-discrimination claims under § 1981, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case for race discrimination by showing "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citation omitted), *aff'd* 566 U.S. 30 (2012). Giles established the first and third elements of this test. As a Black person, he belongs to a protected class. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Further, he was terminated, which constitutes an adverse employment action. *See Holland v. Wa. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (under Title VII, an adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment" (cleaned up)).

As for the second element, to create a triable issue of fact as to satisfactory job performance, a plaintiff must demonstrate that he "was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Critically, under this element, "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980).

From Amtrak's perspective, Giles committed insubordination and did not meet its legitimate expectations. Giles repeatedly refused Sine's orders, even after learning who she was. He did not participate in the required briefing, but still interfered with the uncoupling and argued with Sine in front of passengers in the process. Consequently, Amtrak's hearing officer determined that Giles behaved insubordinately, a decision that both its OLR and the Public Law Board affirmed. Amtrak "considers insubordination a terminable offense due to its severity and adverse impact in the workplace." J.A. 238. As such, Giles did not demonstrate a genuine issue of material fact regarding whether he satisfactorily performed his job duties.

As for the fourth element, Giles did not show that he was treated differently than other similarly situated employees outside his protected class. *See Coleman*, 626 F.3d at 190. To do so, he must present a similarly situated comparator who received more favorable treatment. *Id.* at 191. Giles presented Martino, a white coworker, as a similarly situated comparator, purporting that Martino defied an order from Hibbert but went unpunished. To support this assertion, he submitted declarations from conductor Marvin Johnson and assistant conductor Andrew Chambers. Johnson and Chambers both declared that they heard Martino refuse to work a certain route while on the phone with Hibbert.

The district court found this evidence constitutes inadmissible hearsay because Giles offered Johnson's and Chambers's statements "to prove the truth of the matter asserted" (specifically, that Martino did not comply with Hibbert's order). Fed. R. Evid. 801(c). Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment. *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d

11

1246, 1251 (4th Cir. 1991). Giles argues that the district court erred in his hearsay ruling. But we need not resolve this issue. Even assuming this evidence was admissible, Giles still could not show that he and Martino were similarly situated. Martino declined to work a particular route due to a scheduling issue, which, although perhaps inconvenient and noncompliant, did not pose the same disruption and safety risks as Giles's behavior. Additionally, Giles did not present evidence demonstrating that Martino faced no discipline for his actions short of termination. As such, his assertion of disparate treatment based on race "do[es] not rise above speculation." *Coleman*, 626 F.3d at 191.[4]

IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

---

[4] Giles spends much of his briefing arguing that insubordination was a mere pretext for the racial animus that actually motivated his termination. If an employer produces a non-discriminatory reason for discharging a plaintiff, "the burden then shifts back to the plaintiff to prove . . . that the stated reason for the adverse employment action is a pretext and the true reason is discriminatory." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (citations omitted). However, Giles's own testimony supports Amtrak's position, as Giles admitted that he did not "believe that [he was] held out of service because of [his] race." J.A. 56:9–11. Giles also alleged that Amtrak employees subjected their Black coworkers and subordinates to racist behavior and language, but no evidence indicates that such beliefs motivated Giles's termination. Further, Amtrak only terminated Giles after a full investigation and hearing, a decision that both Amtrak's OLR and the Public Law Board affirmed. Giles offered no evidence calling into question the legitimacy of these decisions. Thus, his assertion of pretext constitutes mere speculation.