In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-1944 & 13-2054

STEPHANIE SUE CARLSON,

*Plaintiff-Appellant, Cross-Appellee,*

*v.*

CSX TRANSPORTATION, INC.,

*Defendant-Appellee, Cross-Appellant.*

Appeals from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:11-cv-66-RLY-WGH — **Richard L. Young**, *Chief Judge.*

ARGUED MARCH 31, 2014 — DECIDED JULY 10, 2014

Before WOOD, *Chief Judge*, and WILLIAMS and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge*. This appeal requires us to revisit the pleading requirements for discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, including claims for retaliation where the employee alleges an ongoing pattern of retaliation. We must also clarify the scope and effect of the Railway Labor Act's mandatory arbi-

tration provision when an employee alleges discrimination or retaliation in violation of federal statutes.

Plaintiff Stephanie Carlson brought several sex discrimination and retaliation claims under Title VII against her employer, defendant CSX Transportation, Inc., a railway company. She also brought a related contract claim based on the settlement she had reached with CSX of an earlier discrimination lawsuit. CSX moved to dismiss, arguing that Carlson's claims were implausible and that some were precluded by the Railway Labor Act (RLA) because they were based on company decisions justified by the terms of a collective bargaining agreement.

For the most part, the district court agreed with CSX, dismissing the majority of Carlson's claims for failure to state a claim upon which relief could be granted and finding that the RLA precluded the remaining claims. Carlson has appealed. We conclude that none of her claims should have been dismissed. The allegations in her complaint are easily sufficient to state claims for sex discrimination and retaliation. And the RLA, which requires that claims arising under collective bargaining agreements in the railway and airline industries be decided in arbitration, does not preclude Carlson's claims, which arise under Title VII and a private contract between Carlson and CSX.

Upon granting CSX's motion to dismiss, the district court also denied as moot a motion for summary judgment that CSX had filed while its motion to dismiss was pending. CSX has cross-appealed and asked us to grant summary judgment in its favor if we conclude (as we do) that the district court erred by dismissing Carlson's claims on the pleadings. We decline to rule on the summary judgment motion that

the district court did not consider. We remand the case for further proceedings.

I.   *Factual and Procedural Background*

We present the relevant facts based on Carlson's allegations, which we must accept as true on appeal from the grant of a Rule 12(b)(6) motion to dismiss. E.g., *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013). Carlson began her career with CSX in 2002 as a clerk. After seeking unsuccessfully to advance in the company, she filed a lawsuit in 2007 alleging sex discrimination. She was promoted twice while that lawsuit was pending, first in 2008 to the position of substitute yardmaster in Birmingham, Alabama, and then in 2009 to the company's manager trainee program. In May 2009 while she was still in manager training, she and CSX negotiated a settlement of her lawsuit. According to her complaint, her superiors at CSX then made the training program intolerable by belittling her, assigning her extra work, and giving her unjustifiably poor evaluations, leaving her no viable choice but to drop out.

Upon leaving the training program, Carlson asked to be reinstated as a substitute yardmaster in Birmingham. Her request was denied. She alleges that the initial explanation she received was that no positions were available, a contention that Carlson knew was untrue. Later a company representative told her that she was denied the position because she had not completed 60 "starts" (shifts) as a substitute yardmaster when she previously held the position. But CSX had allowed a male employee Carlson knows to return to a substitute yardmaster position despite his not having completed 60 starts.

After learning that she could not resume work as a substitute yardmaster in Birmingham, Carlson took a lower-paying position as a clerk in Evansville, Indiana. Two substitute yardmaster positions were posted for Birmingham in September 2009. Carlson applied for them but was rejected. A company representative told her she was ineligible for the positions because Birmingham was outside of her district, though Carlson knows a male employee who was allowed to transfer across districts. When substitute yardmaster positions later opened up in her district in Indiana, Carlson applied for those as well, but she was not even interviewed. She alleges that the people ultimately hired for those positions were less qualified than she.

Carlson filed charges with the Equal Employment Opportunity Commission regarding these events. After completing the EEOC process, she filed this federal lawsuit alleging violations of Title VII, see 42 U.S.C. § 2000e-2 (discrimination) and § 2000e-3 (retaliation), and state contract law. (She actually filed suit in both Alabama and Indiana district courts, but the suits were consolidated in the Southern District of Indiana.) She alleges that her poor treatment in manager training amounted to a constructive demotion motivated by hostility to her sex and in retaliation for her EEOC complaints and the 2007 lawsuit. She also alleges that CSX for the same reasons refused to reinstate her to the substitute yardmaster position she had previously held and refused to select her for any of the substitute yardmaster positions that opened up later. Her contract claim is that CSX breached a no-retaliation clause of the agreement to settle her 2007 lawsuit.

In granting CSX's motion to dismiss, the district court rejected most of Carlson's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. *Carlson v. CSX Transp., Inc.*, No. 3:11-cv-66-RLY-WGH, 2013 WL 869762, at *6–8 (S.D. Ind. Mar. 5, 2013). The only exceptions were her claims based on the decision not to reinstate her as a substitute yardmaster in Alabama immediately after she left the manager training program. The court concluded that the discrimination claim was plausible because Carlson had identified a male comparator and that the retaliation claim was plausible because she was denied the position within one month of the resolution of her 2007 lawsuit. Regarding Carlson's sex discrimination claims relating to the other substitute yardmaster positions, the court explained that she did not state plausible claims for relief because each claim lacked either an allegation that the position was filled by someone else or an allegation that the person who filled the position was male. Her retaliation claims relating to those positions, the court said, were implausible because of the amount of time that had passed (several months) between any protected activity and the denial decisions.

The court also explained that Carlson's sex discrimination and retaliation claims based on being forced out of the manager training program were insufficient. No one at the program had said anything about her sex or told her she would be expelled from the program. Her allegations were "conclusory," the court wrote, and she had not provided "evidence of intolerable working conditions." *Id.* at *7. Moreover, Carlson had not cited any constructive demotion cases, i.e., cases where an employee was forced out of a position yet remained employed by the company. (The parties and the dis-

trict court used the term "constructive discharge," though a more precise description of what Carlson alleges is constructive demotion.)

In dismissing her contract claim, the court gave two related reasons. Her allegations about the settlement agreement were vague (intentionally so because she did not want to risk a claim that she had breached the confidentiality terms), and she had not fixed that problem by providing the court a copy of the agreement.

Returning to the two claims that had survived Rule 12(b)(6)—sex discrimination and retaliation based on CSX's refusal to return her to the substitute yardmaster position in Birmingham—the court dismissed them for lack of subject matter jurisdiction. *Id.* at *8–9. The claims, the court concluded, were precluded by the Railway Labor Act, which requires that any claim of a railroad or airline employee that is "grounded" in a collective bargaining agreement be decided by an arbitrator. See *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994). CSX had argued in its motion to dismiss that it acted in compliance with a collective bargaining agreement when it refused to return Carlson to a substitute yardmaster position. The district court found that CSX's explanation was enough to preclude the claims.

II.  *Timeliness of the Appeal*

CSX contends that Carlson's notice of appeal was untimely because she filed it more than 30 days after the district court entered judgment against her. If CSX were correct, this court would lack jurisdiction over her appeal. See *Bowles v. Russell*, 551 U.S. 205, 209 (2007) (compliance with time limits

on filing appeal is "mandatory and jurisdictional"). We find that Carlson's notice of appeal was timely.

Judgment was entered on March 19, 2013. Within just a few days, Carlson's lawyers told her they would no longer represent her, but they did not move to withdraw their appearances. Then on March 26 Carlson filed a *pro se* "motion to reconsider," explaining that her lawyers had quit and asking the court to reconsider the dismissal of her claims. She said in the motion that she had actually submitted a copy of the settlement agreement, and she argued that the court had mistakenly accepted certain misrepresentations by CSX.

On April 22, more than 30 days after the entry of judgment, the district court entered an order "striking" Carlson's motion because she had signed it herself despite—technically, at least—still being represented by counsel. See Fed. R. Civ. P. 11(a). Two days later, Carlson's lawyers finally filed motions to withdraw, which the court granted. Then, on May 1, nine days after the district court had stricken her motion, new counsel for Carlson filed her notice of appeal.

In a private civil case like this one, a party normally has 30 days from the entry of judgment to file a notice of appeal. See Fed. R. App. P. 4(a)(1)(A). For Carlson that would have been April 18. But if a party files a timely motion listed in Federal Rule of Appellate Procedure 4(a)(4)(A), which includes a motion under Federal Rule of Civil Procedure 59(e) to alter or amend a judgment, the 30-day window to appeal runs from the time the district court "disposes" of the motion.

Our jurisdiction therefore depends on the effect of Carlson's *pro se* motion for reconsideration and the district court's

order striking it. A motion under Rule 59(e) need not be labeled as such or use the words "alter or amend" so long as it "instead uses a synonym, such as 'vacate' or 'reconsider.'" *Borrero v. City of Chicago*, 456 F.3d 698, 699 (7th Cir. 2006). Carlson filed a motion asking the district court to "reconsider" its judgment one week after judgment was entered, well within the 28 days Rule 59(e) allows.

To counter this argument that the notice of appeal was timely, CSX argues that Carlson's motion could not toll the time for filing the notice of appeal because the district court dealt with the motion by striking it rather than denying it. Relying on dictionary definitions of the word "strike," CSX sees Carlson's stricken motion as a "nullity" that should be treated as never having been filed at all. We reject this argument.

The improper signature on Carlson's motion was not an error with jurisdictional consequences. The Supreme Court held in *Becker v. Montgomery*, 532 U.S. 757, 765 (2001), that a curable defect in a signature on a notice of appeal did not render an appeal untimely. That logic easily extends to curable defects in signatures on post-judgment motions that affect the time to file a notice of appeal. As the Court explained in *Becker*, Rule 11(a), which the district court in this case relied upon to strike Carlson's motion, establishes that a defective signature on a filing may be cured. In fact, the rule allows striking only after a missing signature is brought to the attorney's or party's attention and is not promptly corrected. The district court thus erred by not giving Carlson an opportunity to correct the defect in her motion. Moreover, under Rule 4(a)(4)(A), the time to appeal runs from the entry of an order "disposing" of a timely filed Rule 59(e) motion, and

the district court's order striking Carlson's motion undeniably disposed of it, whatever the meaning of the word "strike."

In addition to those reasons, the district court's error in striking the motion *sua sponte* was also problematic here because Carlson's lawyers had told her they would take no further action on her behalf but had not withdrawn their appearances. She thus had no choice but to file the motion herself. Although "hybrid representation" (i.e., a represented party filing papers on her own) is generally to be avoided, see *United States v. Chavin*, 316 F.3d 666, 671–72 (7th Cir. 2002), summarily striking *sua sponte* a *pro se* filing that alerts the court to an attorney's withdrawal is unwarranted. The fact that Carlson's lawyers were slow to withdraw formally should not have been held against her.

CSX offers an additional argument that Carlson's motion for reconsideration could not toll the time to appeal. It argues that the motion was too insubstantial to qualify as a motion under Rule 59(e). But only in extreme cases where a motion was *completely* devoid of substance—meaning that it did not identify a single reason, even a bad one, for the court to reconsider its judgment—have we held that it did not toll the time to appeal. See *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor*, 556 F.2d 818, 819–20 (7th Cir. 1977). Carlson's motion asked the court to reconsider its judgment for substantive reasons (for example because the court had overlooked that she had submitted a copy of her settlement agreement), easily qualifying it as a Rule 59(e) motion. See *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) (explaining that one basis for a Rule 59(e) motion

is that "the court committed a manifest error of law or fact"). To require more from a motion than an identifiable reason for reconsidering (regardless of the reason's merit) would create troublesome uncertainty about when a notice of appeal must be filed and would invite sterile litigation over when unsuccessful motions to reconsider were too weak to toll the time to appeal. We decline to go any further down that road.

III. *Sufficiency of Claims under Rule 12(b)(6)*

To analyze the sufficiency of a complaint we must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). A claim must be plausible rather than merely conceivable or speculative, see *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), meaning that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together," *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010). But the proper question to ask is still "*could* these things have happened, not *did* they happen." *Id.*

In rejecting all but two of Carlson's claims for failing to state a plausible claim for relief, the district court applied the wrong standard. The court repeatedly faulted her for not providing "evidence" in support of her claims, see *Carlson*, 2013 WL 869762, at *6–7, though of course evidence is not required at the pleading stage. And the court relied on summary judgment decisions that addressed not the content of complaints but the evidence needed to take a claim to a jury. E.g., *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 683 (7th Cir. 2000); *Morrow v. Wal-Mart Stores, Inc.*,

152 F.3d 559, 561 (7th Cir. 1999); and *Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir. 1996). The judicial pen may sometimes slip inadvertently in these ways, but in this case the slips signaled accurately that the court had applied too demanding a standard. We assess Carlson's claims under the proper standard for Rule 12(b)(6) determinations.

A. *Sex Discrimination Claims Relating to Substitute Yardmaster Positions*

A complaint alleging sex discrimination under Title VII "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex." *Tamayo*, 526 F.3d at 1084; see also *EEOC v. Concentra Health Services, Inc.*, 496 F.3d 773, 781–82 (7th Cir. 2007) (stressing the simplicity of pleading a Title VII discrimination claim). The plaintiff is not required to include allegations—such as the existence of a similarly situated comparator—that would establish a prima facie case of discrimination under the "indirect" method of proof. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002); see also *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) (observing that *Swierkiewicz* survived *Twombly* and *Iqbal*); *Swanson*, 614 F.3d at 404 (same). While fraud claims, for example, must be pled with particularity, see Fed. R. Civ. P. 9(b), Title VII claims are not subject to a heightened pleading standard. *Swierkiewicz*, 534 U.S. at 513–15. Employers are familiar with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of these claims. *Concentra*, 496 F.3d at 782.

In Carlson's second amended complaint (the operative one), she alleged which positions she sought and was denied, and she attributed the denial to sex discrimination, sat-

isfying the standard applied in *Swanson*, *Tamayo*, and *Concentra*. She then provided additional allegations (which we must accept as true at this stage) that were not needed but bolstered the plausibility of her claims. These include that a male employee was allowed to resume work as a substitute yardmaster without having completed 60 starts and that another man was allowed to transfer across districts, both things Carlson was not allowed to do. Also casting doubt on the honesty of CSX's explanations for not promoting her are Carlson's allegations that the company gave her different reasons at different times regarding the same job opening. Inconsistent explanations by an employer can support a reasonable inference of pretext that can defeat a motion for summary judgment. E.g., *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (reversing summary judgment for employer); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (same).

B.  *Retaliation Claims Relating to Substitute Yardmaster Positions*

Pleading a retaliation claim under Title VII requires the plaintiff to "allege that she engaged in statutorily protected activity and was subjected to an adverse employment action as a result." *Luevano*, 722 F.3d at 1029.[1] The protected activity

---

[1] Following *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013), the protected activity of an employee making a retaliation claim must have been "a but-for cause of the alleged adverse action by the employer." (As opposed to the "lessened causation standard" that applies in Title VII discrimination cases. *Id.* at 2526.) The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity. See *id.* at 2525.

must be specifically identified. *Concentra*, 496 F.3d at 781. Carlson's retaliation claims relating to the substitute yard-master positions include the allegations supporting her discrimination claims, supplemented by the allegation that her employer's actions were caused by protected activity, namely, her EEOC complaints and her lawsuit that began in 2007 and was settled in 2009.

The district court found Carlson's retaliation claim about not being reinstated as a substitute yardmaster when she left the training program to be plausible because CSX's refusal to reinstate her came less than a month after she and the company agreed to a settle her earlier lawsuit. But the court concluded that the five months separating the resolution of the lawsuit and the first of Carlson's later substitute yardmaster applications rendered her other retaliation claims implausible. Five months—"with no other evidence suggesting the protected conduct provoked CSX's retaliation"—was too long for the events to be connected, the court reasoned, because four months was too long under *Hughes v. Derwinski*, 967 F.2d 1168 (7th Cir. 1992).

In *Hughes*, we affirmed the grant of summary judgment on a retaliation claim for the employer because, "standing by itself," four months between the employee's protected activity and his discipline could not support an inference that the two events were related. *Id.* at 1174–75. The "inference of causation weakens as the time between the protected expression and the adverse action increases, and then 'additional proof of a causal nexus is necessary.'" *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001), quoting *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). Even intervals shorter than four months are

unlikely, standing alone, to establish the causation element of a retaliation claim. See *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) ("Under most circumstances, suspicious timing alone does not create a triable issue on causation … .").

Although the district court once again seemed to require evidence at the pleading stage and, in citing only *Hughes*, relied exclusively on a summary judgment case, a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible. If the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed. See, e.g., *Carmody v. Board of Trustees of Univ. of Illinois*, 747 F.3d 470, 480 (7th Cir. 2014) (unexplained three-year gap between employee's report against another employee and his termination made state-law retaliation claim implausible where focus of case was much more immediate dispute, including full due-process hearing, over whether employee had breached security of employer's computer network).

But no bright-line timing rule can be used to decide whether a retaliation claim is plausible or whether it should go to a jury. Other factors can always be relevant. "A mechanistically applied time frame would ill serve our obligation to be faithful to the legislative purpose of Title VII. The facts and circumstances of each case necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment ac-

tion is linked to an employee's earlier complaint." *Oest*, 240 F.3d at 616.

In this case, Carlson has alleged that the resolution of her 2007 lawsuit in 2009 sparked animosity right away and that all of her attempts to advance at CSX since then have been thwarted. She has described an ongoing campaign of retaliation, and her claims must be viewed through that lens. See, e.g., *Warren v. Prejean*, 301 F.3d 893, 900 (8th Cir. 2002) (affirming jury verdict for plaintiff on retaliation claim because, despite over four-year gap between grievance and termination, termination "was the end result of an *ongoing* pattern of retaliatory behavior"); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997) (affirming jury verdict for plaintiff on retaliation claim because "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period," even if the intervening period spanned years).

Carlson's allegations convinced the district court that CSX's initial refusal to reinstate her as substitute yardmaster may have been retaliatory, but the court then concluded that the company's refusal to hire her for the same position a few months later could not possibly have been retaliatory because of the time that had passed. This parsing of events lost sight of the bigger picture, which showed an ongoing pattern of retaliation. Under these circumstances, we conclude that all of Carlson's retaliation claims are plausible and survive Rule 12(b)(6).

C.  *Claims Relating to Training Program*

Also plausible are Carlson's sex discrimination and retaliation claims relating to the manager training program, from which she withdrew just before seeking to resume work as a substitute yardmaster. According to Carlson's complaint, she was treated so poorly in CSX's manager training program that she was effectively forced out. She alleges that the poor treatment was motivated by her sex and by her 2007 lawsuit, which the parties agreed to settle in 2009 while she was in the training program. Her supervisors in the training program were aware of the settlement negotiations because she had to take time off to attend them, and the supervisors' hostility toward her increased substantially upon her return from the successful negotiations.

The district court concluded that her allegations of regular belittlement, unfair criticism, and unduly poor assessments were insufficient to support either claim. No one had said anything overtly sexist or told Carlson's that she would soon be dismissed from the program. Her allegations were "conclusory," the court said, and she did not offer "evidence of intolerable working conditions." Nor did Carlson cite cases involving employees who were forced out of a position but not out of the company.

These were not sufficient reasons for dismissing Carlson's claims on the pleadings. Even if a claim might theoretically be too "conclusory"—a theory hard to square with *Swierkiewicz* and *Swanson*, at least where the situation is identified and unlawful motivation alleged—Carlson included specific examples of poor treatment. A work environment, it is true, must be "intolerable" to support a constructive discharge claim. See *Chapin v. Fort-Rohr Motors, Inc.*,

621 F.3d 673, 679 (7th Cir. 2010). The conditions Carlson described in her complaint may not ultimately qualify as intolerable, but we cannot say so definitively at the pleading stage, which (we stress again) is before any evidence is required. And although "constructive demotion" (what Carlson has actually asserted) is an unusual claim, it is nonetheless a viable legal theory. See *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) ("[A] constructive demotion analysis should have the same structure as that for constructive discharge.").

Before moving on to the contract claim and the RLA issues, we also note that all the discrimination and retaliation claims in Carlson's first amended complaint also satisfied Rule 12(b)(6). The district court simply demanded too much at the pleading stage here, resulting in further efforts at pleading to reach a standard that is rarely realistic before discovery. This case therefore illustrates well the important distinction the Supreme Court drew in *Swierkiewicz* between pleading requirements and evidentiary requirements. 534 U.S. at 510–12 (holding that plaintiff need not plead elements of prima facie case under indirect proof method).

To illustrate this point, consider the need to identify similarly situated employees as part of the prima facie case under the indirect proof method. As we explained in *Coleman v. Donahoe*, 667 F.3d 835, 847–50 (7th Cir. 2012), the identity of the employer's decision-maker and the employer's stated reason for its decision are critical in figuring out who else might have been similarly situated. The employee often will not be able to answer those questions without discovery. See *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1184–85 (7th Cir. 2013) (Hamilton, J., concurring). The plaintiff is not required

to identify similarly situated comparators at the pleading stage. And the very complexity of the dance between the interdependent steps of the indirect proof method supports Chief Judge Wood's suggestion in her concurrence in *Coleman* that it is time to collapse the different methods of proof into one test: whether a rational jury could find that the employer took action against the plaintiff for an unlawful reason. 667 F.3d at 862–63.

D. *Contract Claim*

Carlson explained in her complaint that her contract claim was intentionally vague because she was bound by a confidentiality clause in the settlement agreement. She asked the court to allow her to submit the settlement agreement for *in camera* review. The district court dismissed the claim on the basis that Carlson never provided a copy of the agreement. But as Carlson first pointed out in her Rule 59(e) motion—and as the record confirms—she did submit the agreement under seal to the district court. Thus the court's dismissal of this claim must be reversed as well. (During oral argument, Carlson's lawyer acknowledged that the contract claim stands or falls with the retaliation claims. It is not clear how much the claim adds to the case, but that can be addressed later.)

IV. *Preclusion by the Railway Labor Act*

Two claims survived the district court's scrutiny under Rule 12(b)(6): Carlson's discrimination and retaliation claims relating to CSX's failure to reinstate her as substitute yardmaster just after she left the manager training program. These claims, the court determined, were precluded by the Railway Labor Act (RLA), which requires that certain claims

be resolved through arbitration under the Act. The court dismissed the claims for lack of subject matter jurisdiction.

A. *Jurisdictional Requirement?*

Before addressing whether any of Carlson's claims were in fact subject to mandatory arbitration, we briefly call attention to the issue whether a party's failure to comply with the RLA's arbitration provision deprives federal courts of subject matter jurisdiction rather than simply defeats the claim. The distinction between the two grounds for dismissal is inconsequential in this case, where waiver is not an issue because the defendant argued RLA preclusion at every stage, but it could matter in others.

The district court, in treating the RLA's arbitration requirement as jurisdictional, naturally followed this court's practice of referring to the requirement in those terms. See, e.g., *Brotherhood of Maintenance of Way Employees Division/IBT v. Norfolk Southern Ry. Co.*, 745 F.3d 808 (7th Cir. 2014); *Brown v. Illinois Central R.R. Co.*, 254 F.3d 654 (7th Cir. 2001). But our longstanding practice under the RLA has not yet taken into account the lesson of *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), and other similar cases in which the Supreme Court has explained that many statutory requirements that have been termed "jurisdictional" are actually just elements that must be satisfied for a plaintiff to prevail. "Jurisdiction" is a word with "many, too many, meanings," and a proper ruling on whether a party's failure to meet a statutory requirement deprives federal courts of subject matter jurisdiction must be based on whether Congress clearly indicated that it was setting a jurisdictional limitation. *Id.* at 510–11, 515–16.

When a future case requires a decision on whether the RLA's arbitration provision is jurisdictional, we will need to consider carefully the opposing positions recently taken on the issue by the D.C. and Sixth Circuits. Compare *Oakey v. US Airways Pilots Disability Income Plan*, 723 F.3d 227 (D.C. Cir. 2013) (RLA arbitration requirement is jurisdictional), with *Emswiler v. CSX Transportation, Inc.*, 691 F.3d 782 (6th Cir. 2012) (not jurisdictional). We need not and do not decide the issue in this case.

B. *Claims Grounded in the Collective Bargaining Agreement?*

Congress passed the RLA, which governs railroads and airlines, to provide for "the prompt and orderly settlement" of labor disputes in those industries. 45 U.S.C. § 151a; see *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) ("Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes."). To that end, the Act requires that so-called "minor disputes" be resolved in arbitration before an adjustment board established by the employer and union rather than in court. *Hawaiian Airlines,* 512 U.S. at 252; *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 563, 566 (1987); *Brown*, 254 F.3d at 658. Minor disputes are those "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). In other words, minor disputes are those "grounded in" a collective bargaining agreement. *Hawaiian Airlines*, 512 U.S. at 256. (By contrast a "major dispute" is one involving the formation or modification of a collective bargaining agreement. *Id.* at 252; *Chicago & North Western*

*Transp. Co. v. Railway Labor Executives' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990).)

In this case we must fit Title VII claims into this framework, taking care not to interpret the RLA as excluding a class of employees from statutory protections against employment discrimination and retaliation. CSX's position is that the RLA precludes Carlson's Title VII claims simply because the company says that, in refusing to reinstate Carlson as a substitute yardmaster, it acted pursuant to a collective bargaining agreement rather than for discriminatory or retaliatory reasons. Carlson's position is that the RLA does not preclude her claims because she is not asserting any right under the collective bargaining agreement, which in any event does not itself prohibit sex discrimination or retaliation.

The Supreme Court's decision in *Hawaiian Airlines* provides important guidance. The plaintiff in *Hawaiian Airlines* was an airline mechanic who was fired after he refused to sign a maintenance record when he believed the airplane was still not safe. He sued his former employer for wrongful discharge under a state whistleblower law and a public policy exception to employment at will. The employer contended that the RLA preempted the plaintiff's claim because his discharge may have been justified under the collective bargaining agreement. The Supreme Court rejected that argument: a claim based on a right that is "independent" of a collective bargaining agreement is *not* subject to mandatory arbitration, and a claim is independent if it cannot be "conclusively resolved" by interpreting the collective bargaining agreement. *Hawaiian Airlines*, 512 U.S. at 263, 265. This analysis applies regardless of whether the independent right as-

serted is based on state or federal law. The Court made this clear in *Hawaiian Airlines* by reaffirming the holding of *Atchison, Topeka and Santa Fe Ry. Co. v. Buell* that the RLA does not preclude claims under the Federal Employers' Liability Act even when the employee may also have a claim based on the same facts under the collective bargaining agreement. See 512 U.S. at 258–59, citing *Buell*, 480 U.S. at 564–65.

The line drawn in *Hawaiian Airlines*—disputes over rights under a collective bargaining agreement must be resolved by an arbitrator while claims based on rights with an independent basis may be litigated as usual—is generally easy to discern. On occasion, however, a claim is brought under state or federal law that in reality asserts rights established by a collective bargaining agreement. For example, in *Tice v. American Airlines, Inc.*, 288 F.3d 313, 316–17 (7th Cir. 2002), we found that the employees' claims under the Age Discrimination in Employment Act were precluded because they relied on a contention that the collective bargaining agreement entitled the employees to certain positions. And sometimes a nominally independent claim can be "conclusively resolved" by interpreting a collective bargaining agreement because the claim's success depends entirely on the agreement's meaning. See *Brown*, 254 F.3d at 660–61. In *Brown*, the plaintiff's accommodation request under the Americans with Disabilities Act (ADA) "might very well violate the seniority system established by the CBA," and the ADA does not require accommodations that interfere with the seniority rights of other employees. *Id.* at 661; see *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1046 (7th Cir. 1996). The "heart of the dispute" in *Brown*, we explained, was "a disagreement over

the interpretation" of a collective bargaining agreement. 254 F.3d at 664.

Carlson's claims do not fall into the exception illustrated by *Tice* and *Brown* to the general rule that the RLA does not require arbitration of claims asserting rights established by state or federal law independent of a collective bargaining agreement. Unlike the plaintiff in *Tice*, Carlson does not claim that she was entitled to a particular job under the collective bargaining agreement. She alleges that her applications were rejected because of her sex and in retaliation for protected activity, in violation of Title VII. Her claims thus depend on a "factual inquiry into any retaliatory [or discriminatory] motive of the employer" rather than on an interpretation of the collective bargaining agreement. See *Hawaiian Airlines*, 512 U.S. at 266 (finding such claims are not precluded or preempted by RLA).

CSX argues that Carlson's claims could be conclusively resolved by an arbitral ruling that she was not qualified under the collective bargaining agreement to be a substitute yardmaster, making her claims equivalent to those in *Brown*. The argument is based on a misunderstanding of the nature of her claims. Even if Carlson did not have the qualifications specified in the collective bargaining agreement, she would still have viable Title VII claims if, as she alleges, the same potentially disqualifying attributes have been overlooked for men or for others who have not complained about discrimination. See *Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 873 (7th Cir. 2011) (holding that a flight attendant's claim that a collective bargaining agreement's voucher policy was enforced against her discriminatorily in violation of Title VII was not precluded by the RLA because the claim did not "call the

policy itself into dispute"); *Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 349–50 (5th Cir. 2008) (claims under Title VII avoided RLA preclusion because plaintiff alleged "that CBA procedures were *applied* in a discriminatory manner, not that CBA procedures were fundamentally discriminatory").

As we were careful to clarify in *Brown*, a claim is not barred simply because "the action challenged by the plaintiff is 'arguably justified' by the terms of the CBA." 254 F.3d at 668, quoting *Hawaiian Airlines*, 512 U.S. at 265–66. An "employer cannot ensure the preclusion of a plaintiff's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim." *Id.* at 668. And the fact that a collective bargaining agreement might be consulted in resolving a plaintiff's claims is insufficient to trigger RLA preclusion. Claims are not precluded just "because certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor in deciding a claim or a defense." *Id.*

All this is to say that RLA preclusion, properly applied, does nothing more than keep disputes actually arising under a collective bargaining agreement out of court. Employees may enter into a contract requiring that other types of claim be brought only in arbitration, but if a collective bargaining agreement simply prohibits employers from doing something (for example discriminating on a certain basis) or merely *allows* arbitration of some type of claim, a claim under an independent law covering the same subject matter is not precluded. See *Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d 1416, 1419 (9th Cir. 1995) (Title VII claim of religious discrimination was not precluded simply because the collective bargaining agreement "provides for arbitration of claims

of religious discrimination"); see also *Hawaiian Airlines*, 512 U.S. at 262–63 (explaining that a wrongful discharge claim based on state law can go forward even if it depends on the same facts as a wrongful discharge claim under a collective bargaining agreement).

So Carlson's claims under Title VII could proceed in federal court even if the collective bargaining agreement prohibited sex discrimination and retaliation. Notably, however, the collective bargaining agreement in this case (as CSX conceded at oral argument) does *not* prohibit sex discrimination or retaliation, meaning that CSX is making a truly radical argument: that Carlson cannot assert *in any forum* her right to be free from sex discrimination and retaliation. We can see no reason to apply the RLA in a way that, in addition to having no basis in the text, would lead to that extraordinary result.

## V. *CSX's Motion for Summary Judgment*

In its cross-appeal, CSX asks that we grant summary judgment in its favor if we should decide that Carlson's claims were erroneously dismissed. We have so decided, but we decline to take the unusual step of ruling on a summary judgment motion that the district court has not considered, especially one as fact-intensive as this one. The district court should take the first crack at it. On remand, however, a new briefing schedule for summary judgment motions will need to be set because no motion for summary judgment is currently pending. (The district court denied CSX's motion as moot.) Because our decision also reshapes the case by restoring the claims erroneously dismissed on RLA grounds, the court should reopen discovery so that Carlson can gather

and present additional evidence now that she is represented by new counsel.

The district court's dismissal of Carlson's claims is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.